IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

VICKY SILVA, an Oregon consumer,                    No. 3:17-cv-00391-HZ
individually and on behalf of all others
similarly situated,

                Plaintiffs,

     v.

UNIQUE BEVERAGE COMPANY, LLC,                    OPINION & ORDER
a foreign corporation,

                Defendant.


Michael Fuller
OLSEN DAINES PC
111 S.W. 5th Avenue, Suite 3150
Portland, Oregon 97204

Mark Geragos
Benjamin J. Meiselas
GERAGOS & GERAGOS
644 South Figueroa Street
Los Angeles, California 90017

       Attorneys for Plaintiff

Joe Hochman
HOCHMAN LEGAL GROUP, PLLC
4580 Klahanie Drive S.E., Suite 165
Sammamish, Washington 98029

      Attorney for Defendant

HERNANDEZ, District Judge:

      In this putative class action brought by Plaintiff Vicky Silva on behalf of herself and all others similarly situated against Defendant Unique Beverage Company, LLC, Plaintiff contends that the labeling on one of Defendant's products is misleading and in violation of Oregon's Unlawful Trade Practices Act, Oregon Revised Statutes §§ (O.R.S.) 646.605-646.656 (UTPA). In a June 15, 2017 Opinion & Order, I granted Defendant's motion to dismiss the Amended Complaint but gave Plaintiff leave to amend. *Silva v. Unique Beverage Co.*, No. 3:17-cv-00391-HZ, 2017 WL 2642286 (D. Or. June 15, 2017) (hereinafter "the June 15, 2017 Opinion"). On June 28, 2017, Plaintiff filed a Second Amended Complaint, ECF 28. Defendant now moves to dismiss the amended pleading for failure to state a claim. I grant the motion as to the allegations in Paragraph 18, deny the motion as moot as to any claim for injunctive relief, and otherwise deny the motion.

## BACKGROUND

      In the Second Amended Complaint, Plaintiff alleges that in February 2017, she purchased a "Cascade Ice" beverage product manufactured by Defendant. Sec. Am. Compl. ¶¶ 4, 5. The front label depicted large colorful coconuts along with the word "Coconut." *Id.*[1] Below the word

---

[1] Plaintiff's Second Amended Complaint contains three images of the front of the bottle. The image preceding Paragraph 1 and the image shown in Exhibit 1 to the Second Amended Complaint differ from the image alleged as part of Paragraph 5. The image in Paragraph 5, although smaller and difficult to read, omits the words "With Juice" towards the bottom of the

"Coconut," the label stated that the product is a "NATURALLY FLAVORED SPARKLING WATER" beverage. *Id.* The front label looks like this:



Fuller Decl., ¶ 2, ECF 40.

      Plaintiff asserts that the product contains no coconut, coconut water, coconut juice, coconut pulp, coconut jelly, or coconut natural flavor. *Id.* at ¶ 4. Additionally, she contends it

label. In her Sur-Reply, Plaintiff clarifies that the images preceding Paragraph 1 and in Exhibit 1 to the Second Amended Complaint which show the label containing the "With Juice" language, along with all references to the words "With Juice" as being on the front label in Paragraphs 20, 33, 38, and 40, are in error and do not represent the product she purchased. Pl. Sur-Reply, ECF 39. Plaintiff concedes that the correct image is one included in Defendant's Request for Judicial Notice, ECF 30, and represented again in Paragraph 2 of Fuller's Declaration in Support of Plaintiff's Sur-Reply. Fuller Decl., ECF 40.

does not taste like coconut and has no coconut health qualities. *Id.* Plaintiff alleges that the label violates O.R.S. 646.608(1)(b) because it causes the likelihood of confusion and misunderstanding as to the source of the flavoring, ingredients, and properties in Defendant's product. *Id.* ¶ 15. Further, she contends that the label violates O.R.S. 646.608(1)(e) because it falsely represents that Defendant's coconut product had ingredients, characteristics, benefits, quantities, or qualities it did not have. *Id.* She also alleges that the label violates O.R.S. 646.609(1)(g), because it falsely represented that Defendant's coconut product was of a standard, quality, or grade it did not have. *Id.*

Plaintiff seeks damages under three different theories: a diminished value theory, a purchase price refund theory, and an objective market value loss theory. *Id.* ¶¶ 16, 17, 18. These damages allegations are discussed in more detail below. Plaintiff seeks actual damages or $200 statutory damages. *Id.* ¶ 19. Finally, based on her allegation that Defendant's violation of the UTPA was reckless and in pursuit of profit, she seeks punitive damages. *Id.*[2]

/ / /

---

[2] In the motion to dismiss the Amended Complaint, Defendant argued that Plaintiff could not state a claim for injunctive relief. *See* June 15, 2017 Op., 2017 WL 2642286, at *14. In response, Plaintiff withdrew her request for an injunction. *Id.* Thus, I denied that portion of Defendant's motion as moot. *Id.* Although the Prayer in the Second Amended Complaint contains no request for injunctive relief, Sec. Am. Compl. at 16, there is an earlier reference to injunctive relief in the section of that pleading containing the class allegations. *Id.* ¶ 14 ("Injunctive relief will prevent further ongoing harm to Oregon consumers[.]"). Defendant renews its motion to dismiss the injunctive relief claim. I deny the motion as moot because it is apparent to the Court that this single reference to injunctive relief in the Second Amended Complaint is an oversight. Of the many references to injunctive relief that were in the Amended Complaint, including an express request for injunctive relief in the Prayer of that earlier pleading, this single reference is the only one remaining. All others have been omitted in the Second Amended Complaint. Thus, I construe the Second Amended Complaint consistently with Plaintiff's prior representation that the request for injunctive relief is withdrawn.

## STANDARDS

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept all material facts alleged in the complaint as true and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett–Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012).

A motion to dismiss under Rule 12(b)(6) will be granted if a plaintiff alleges the "grounds" of his "entitlement to relief" with nothing "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]" *Id.* (citations and footnote omitted).

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face[,]" meaning "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Additionally, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. A complaint must contain "well-pleaded facts" which "permit the court to infer more than the mere possibility of misconduct[.]" *Id.* at 679.

DISCUSSION

Defendant argues that dismissal of the Second Amended Complaint is warranted because no reasonable juror could be confused by the product labels and thus, as a matter of law the product is not deceptive. Defendant also argues that Plaintiff fails to sufficiently allege damages.

I. Labeling

Generally, whether a product's labels are deceptive under a consumer protection statute is a question of fact for the jury. *See Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938-39 (9th Cir. 2008) (in case challenging product's labeling as deceptive under California law, court noted that California courts "recognized that whether a business practice is deceptive will usually be a question of fact"). However, as with many fact questions, if the court determines that no reasonable juror could conclude that the product's label was not deceptive or misleading, dismissal on a Rule 12(b)(6) motion is appropriate. *E.g.*, *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1162 (9th Cir. 2012) (in false advertising claim under California statute, court quoted *Williams* for the proposition that the issue of deception is usually a question of fact, but court nonetheless affirmed the district court's dismissal of the claim at the pleading stage because as a matter of law, the advertising at issue was not likely to deceive a reasonable consumer); *Pelayo v. Nestle USA, Inc.*, 989 F. Supp. 2d 973, 978 (C.D. Cal. 2013) (citing *Williams* for the proposition that the "question of whether a business practice is deceptive in most cases presents a question of fact not amenable to resolution on a motion to dismiss[,]" but concluding that "where a Court can conclude as a matter of law that members of the public are not likely to be deceived by the product packaging, dismissal is appropriate"); *Hairston v. S. Beach Beverage Co.*, No. CV 12-1429-JFW DTBX, 2012 WL 1893818, at *4 (C.D. Cal. May 18, 2012) (citing *Williams* but

noting that "in certain instances, the Court can properly make [the deception] determination and resolve such claims based on its review of the product packaging" and finding dismissal on a Rule 12(b)(6) appropriate "where a Court can conclude as a matter of law that members of the public are not likely to be deceived by the product packaging[.]").

In *Pearson v. Philip Morris, Inc.*, the Oregon Supreme Court indicated that whether a product's label was a misrepresentation under the UTPA "is determined based on an objective standard of what a reasonable consumer would understand the representation to be[.]" 358 Or. 88, 135 n.26, 361 P.3d 3, 32 n.26 (2015); *see also Andriesian v. Cosmetic Dermatology, Inc.*, No. 3:14-cv-01600-ST, 2015 WL 1638729, at *3 (D. Or. Mar. 3, 2015) (to state a false labeling claim under the UTPA, "plaintiff must affirmatively plead and prove that the statements at issue are either objectively false or at least likely to mislead a reasonable consumer."), *adopted*, 2015 WL 1925944 (D. Or. Apr. 28, 2015).

Defendant argues that when the labeling of the entire bottle of its Cascade Ice beverage is considered, no reasonable consumer could be misled into believing that the product contained any coconut. Cases suggest that it is appropriate to consider the entirety of a label in ascertaining whether a reasonable consumer would find a product deceptive or misleading. In *Freeman v. Time, Inc.*, 68 F.3d 285, 289-90 (9th Cir. 1995), the Ninth Circuit relied on qualifying language in smaller font to conclude that no reasonable consumer would be deceived by the larger font statements suggesting that the mailer's recipient had won a sweepstakes. The court also rejected the plaintiff's argument that a certain statement was ambiguous because the contention was "unreasonable in the context of the entire document." *Id.* at 290; *see also Lam v. Gen. Mills, Inc.*, 859 F. Supp. 2d 1097, 1104 (N.D. Cal. 2012) (court looked at side panel as well as front, back,

top, and bottom panels of package in making reasonable consumer determination).

In *Williams*, the Ninth Circuit concluded that misleading label information on the front of a product cannot be corrected by an ingredient list. 552 F.3d at 939. There, the court determined that a number of features on the packaging "could likely deceive a reasonable consumer." *Id.* at 939. In light of such deceptive packaging, the court rejected the use of the ingredient list as a "shield for liability for the deception[,]" explaining that a reasonable consumer is not "expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box." *Id.*

*Williams* does not hold, however, that an ingredient list, along with other information on the label, is irrelevant in determining whether the package as a whole is misleading or deceptive. Rather, as a 2016 Ninth Circuit case put it, "[s]tated straightforwardly, *Williams* stands for the proposition that *if* the defendant commits an act of deception, the presence of fine print revealing the truth is insufficient to dispel that deception." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 966 (9th Cir. 2016). Thus, an ingredient list alone cannot remedy an otherwise misleading or deceptive package but it still plays a part in assessing whether the package as a whole is misleading.

Defendant points to six features of the label that it argues dispel any notion that the product contains coconut. First, the front of the label states, as indicated above, that it is "NATURALLY FLAVORED SPARKING WATER." Def. Req. for Jud. Notice, Ex. C.[3]

---

[3] Defendant asks the Court to take judicial notice of three images of the product and Plaintiff's sales receipt. Def. Req. for Jud. Notice, Exs. A-D. Plaintiff makes no objection to the request. On a motion to dismiss, a court may consider a document on which the complaint "necessarily relies" if (1) "the complaint refers to the document,"(2) "the document is central to the plaintiff's claim," and (3) "no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). Those three criteria are satisfied here for the images of the product because Plaintiff herself refers to the

Second, the front label also states that the beverage has "Zero Calories." *Id.* Third, the back or side of the label, near the top and above the Nutrition Facts section, states that it "Contains No Coconut." *Id.*, Ex. A. Fourth, immediately below the "Contains No Coconut" language, and immediately above the Nutrition Facts section, the label states that it contains "1% Fruit Juice." *Id.* Fifth, the Nutrition Facts section shows that the beverage has zero calories, zero fat, zero sugars, and no potassium. *Id.* Finally, the ingredient list confirms there is no coconut of any kind in the product. *Id.* The entire label, in relevant part, looks like this:



product's labels, the viability of Plaintiff's UTPA claim depends on the labeling of the product when viewed as a whole, and Plaintiff does not question the authenticity of the label images Defendant produces. As to the receipt, Plaintiff does not question the authenticity of the document. Although she does not allege the actual price she paid, she does assert that she "paid more money" for the product than she would have paid for a similar beverage that also contained no coconut. Sec. Am. Compl. ¶ 16. This is enough to satisfy the requirement that the complaint refer to the document. Finally, given that at least one of Plaintiff's theories of loss requires showing that she "paid too much," the price she paid is likely central to her claim. Thus, the criteria for consideration of all four documents is satisfied. I grant the judicial notice request.

Def. Req. for Jud. Notice, Ex. C.

Defendant argues that taken as a whole, no reasonable consumer would conclude that the beverage contains coconut or has coconut health qualities. Defendant contends that although the label depicts coconuts, the statement "Zero Calories" on the front, as well as the Nutrition Facts section on the back or side which recites zero calories, zero fat, zero sugars, and no potassium, are all inconsistent with a product that actually contains coconut. Notably, the back or side label states, separately from the Nutrition Facts section or the ingredient list, that the product "Contains No Coconut." Because the product label itself establishes that it is not misleading or deceptive, Defendant argues that dismissal is appropriate.

As can be seen from the images of the product's label reproduced in this Opinion, the front of the bottle is adorned with fairly large images of several coconuts. The word "Coconut" is prominently displayed on a white background. Although the words "NATURALLY FLAVORED SPARKLING WATER" appear on the front, they are in smaller font than the word "Coconut." Moreover, these words are separate from the word "Coconut" such that a reasonable consumer would not necessarily understand the label to represent a naturally coconut-flavored drink. A reasonable consumer could understand a phrase like "naturally coconut-flavored sparkling water" to mean a drink that was flavored to taste like coconut but not necessarily containing coconut.[4] But when the word "Coconut" is not part of the "naturally flavored" phrase, that understanding is not necessarily the only reasonable one to be drawn. Instead, a reasonable consumer could understand that he or she was purchasing a drink containing coconut and which also was naturally flavored. The large coconut depictions, the prominence of the word

---

[4] I do not mean to imply that this understanding is the only reasonable one.

"Coconut," and the words "NATURALLY FLAVORED SPARKLING WATER," plus the location of those words separate from the word "Coconut" could cause a reasonable consumer to believe that he or she was buying a sparkling water beverage containing coconut.

This understanding is not diminished by the "Zero Calories" statement on the front of the bottle or by the Nutrition Facts showing that the product has zero calories, zero fat, and zero sugars. Reasonable consumers do not necessarily possess information about the calories of any given fruit, vegetable, or other featured characteristic and so may not know that if the product contained actual coconut it would likely have some calories or fat. Many consumers could rationally assume that the product had zero calories, fat, or sugar yet still contain some natural coconut flavor. After all, the beverage contains pear juice concentrate yet obviously not in sufficient quantity to provide calories, fat, or sugars. Moreover, contrary to Defendant's suggestion, the Nutrition Facts section does not expressly state that it has no potassium. It lists, as is relevant here, the total fat, sodium, total carbohydrate, and protein as all zero, and then states in fairly small print that the product is "[n]ot a significant source of other nutrients." Thus, unless the purchaser knows that coconuts are a good source of potassium, and there is no reason to conclude that a reasonable consumer would actually possess that knowledge, the fact that the Nutrition Facts section lacks any information about the potassium content of the product is meaningless. Moreover, the ingredient list includes "Potassium Benzoate (Preservative)," and a reasonable consumer could mistakenly assume this was potassium, the element. The ingredient list also shows that the product contains potassium citrate, further reinforcing the suggestion, for those who know about the amount of potassium in coconut, that coconut is in the product.

As to the "1% Fruit Juice" language on the back or side of the label, Defendant argues

that a reasonable consumer would understand the product contains no coconut because a coconut "is a nut, not a fruit." Def.'s Mot. 15, ECF 29. Defendant states that "the FDA confirms that coconut is a nut, not a fruit." *Id.* Defendant provides no authority or citation for this assertion. A coconut is defined as "the fruit of the coconut palm that is a drupe consisting of an outer fibrous husk that yields coir and a large nut containing the thick edible meat, and in the fresh fruit, a clear fluid called coconut milk." *Webster's Third New Int'l Dictionary* 437 (unabridged ed. 2002).[5] Regardless of what the FDA considers a coconut to be, given that a dictionary defines it as the "fruit" of the coconut palm which then contains a nut, reasonable consumers could assume that the presence of fruit juice was consistent with the presence of coconut.

The product does not hide that it contains no coconut. This is made plain on the back or side label. But, due to the prominence of the coconut depictions on the front label and the word "Coconut," a reasonable consumer could understand the statement that the beverage contains no coconut to mean that it contains no coconut meat or coconut milk, but that it still contained some quantity of a coconut derivative such as coconut water or natural coconut flavor. Thus, the term is ambiguous. And here, unlike in *Freeman*, considering the phrase in the context of the entire label does not eradicate the ambiguity. In fact, the context creates the ambiguity.

Finally, given that the label as a whole could be misleading to the reasonable consumer, the fact that the ingredient list shows that it contains no coconut or coconut derivative cannot be used to grant dismissal on a Rule 12(b)(6) motion under *Williams*. Thus, I deny the motion to dismiss based on the "reasonable consumer" argument.

---

[5] A "drupe" is "a one seeded indehiscent fruit having a hard bony endocarp[,]" *Websters* 696, and a "coir" is "a stiff coarse fiber from the outer husk of a coconut." *Id.* at 441.

II.  Damages Allegations

In the June 15, 2017 Opinion, I addressed Plaintiff's damages allegations and concluded that they were insufficient to state a claim.  June 15, 2017 Op., 2017 WL 2642286, at **9-12.  There, I discussed the required elements of Plaintiff's UTPA claim, including causation and ascertainable loss.  *Id.* at 9.  The loss, as I stated, must be objectively verifiable, be specifically of money or property, and be caused by the unlawful trade practice.  *Id.* (discussing *Pearson*, 358 Or. at 116-17, 361 P.3d at 22-23).

In describing Plaintiff's claim, I noted that the Amended Complaint appeared to allege ascertainable loss under the two theories discussed at length in *Pearson*:  diminished value and purchase price refund.  *Id.*  I concluded that the Amended Complaint lacked sufficient allegations in support of either theory.  I dismissed the Amended Complaint, but gave Plaintiff leave to amend.

In the Second Amended Complaint, Plaintiff sets forth three theories to support the ascertainable loss element of her UTPA claim.  She reasserts both a diminished value and purchase price refund theory.  Sec. Am. Compl. ¶¶ 16, 17.  She also adds a theory she refers to in the briefing as "objective market value loss."  *Id.* ¶ 18; Pl.'s Resp. 31, ECF 31.  Defendant argues that the Second Amended Complaint fails to adequately allege ascertainable loss under any of the theories.

A.  Diminished Value Theory

According to *Pearson*, the basis of the diminished value theory is that the product purchased is worth less than what the injured customer paid for it.  *Pearson*, 358 Or. at 118, 361 P.3d at 23.  *Pearson* provides that for consumable goods, a purchaser relying on a diminished

value theory of ascertainable loss in an UTPA claim, suffers an economic loss only in the form of having paid too much at the time of purchase. *Id.* at 123, 361 P.3d at 26; *see also id.* at 123, 361 P.3d at 25 (diminished value theory requires reasonable inference that the plaintiff "paid too much"). Thus, in the instant case, the diminished value theory must assert that Defendant's beverage representing itself as containing coconut, but which contained no coconut, cost more than a similar beverage lacking coconut. That is, misrepresenting the beverage as containing coconut caused the price to be higher than it should have been because a similar product without coconut is worth less than a product actually containing coconut and costs less than the price paid by Plaintiff.

In support of her diminished value theory Plaintiff alleges that she "paid more money, per fluid ounce, for defendant's so-called coconut product" than she "could have paid for other similar beverage products that also did not contain any actual coconut." Sec. Am. Compl. ¶ 16. She continues:

> Therefore, as a result of defendant's false representations, . . . that its so-called coconut product was flavored by and contained some actual coconut, [Plaintiff] and the Oregon class suffered an ascertainable loss in the amount of the diminished value between the higher price paid per fluid ounce for defendant's so-called coconut product and the lower price that they could have paid for those similar alternative beverage products[.]

*Id.*

Defendant first argues that Plaintiff cannot plausibly allege that she "paid more money" for Defendant's Cascade Ice beverage than she could have paid for a similar beverage that also did not contain any actual coconut. Plaintiff paid only $0.68 for each bottle of the beverage.[6]

---

[6] The Second Amended Complaint contains a copy of an undated receipt from Safeway showing the purchase of a "Cascade Ice Coconu" for $0.88 which was $0.61 cents off of the

Defendant contends that nothing in the Second Amended Complaint suggests that water containing coconut is sold for the same or similar price as what she paid. Thus, she fails to allege sufficient facts to support an inference that the price she paid for Defendant's beverage was more than the price charged for a similar beverage without coconut.

In support, Defendant asserts that a "simple online search" demonstrates that beverages containing actual coconut or coconut water cost as much as three to six times more than what Plaintiff paid for the Cascade Ice beverage. Def. Mot. 20 & n.4 (citing to products available on amazon.com). Given that, Defendant argues that Plaintiff has not adequately alleged that the price of the good representing a particular coconut water feature is not the same as the price of the good lacking such a feature. Defendant asserts that actually, the opposite is true: Plaintiff paid $0.68 for a beverage that contains no coconut, the same price or even less than what is regularly charged for beverages containing no coconut. *Id.* In other words, because Plaintiff paid only $0.68 for the beverage and because beverages containing coconut are more expensive, she cannot plausibly allege that the misrepresentation that the product contained coconut resulted in a price higher than it should have been and that she paid more for it than she would have paid for a product that contained no coconut.

Defendant is correct that under *Pearson*, Plaintiff must establish that she paid too much for the product because the product misrepresented that it contained coconut. *Pearson*, 358 Or.

_____

regular price of $1.49. Sec. Am. Compl. ¶ 9. The image of this receipt is included in the allegations made in support of the class action contending that class members will be identifiable by retail stores which sell Defendant's product because many of the customers participate in "card savings" discount programs and have a unique card number allowing them to be located. *Id.* It appears to be an example of such a receipt and does not purport to be Plaintiff's receipt. Plaintiff's actual receipt shows that she paid $0.68 per bottle for Defendant's product. Def. Req. for Jud. Notice, Ex. D.

at 123, 361 P.3d at 25 (diminished value theory requires a reasonable inference that the plaintiff and class members "paid too much").  She must show that the value of the product as represented (containing coconut) was more than the value of the product she received (without coconut). But, Defendant's plausibility argument (that the fairly low price she actually paid for the beverage relative to the price of a similar beverage that actually contains coconut makes her theory implausible), relies on facts outside of the pleading - namely, Defendant's citation to the cost of various beverage products containing coconut for sale on amazon.com.  Because these facts are not referred to in the Second Amended Complaint, it is inappropriate to consider them on a motion to dismiss.

Second, Defendant argues that Plaintiff fails to use any dollar figures or other facts showing diminished value or overpayment.  Defendant contends the Second Amended Complaints lacks specifics and alleges in only conclusory terms that she "paid more money" than she otherwise would have.  Defendant relies on a New Jersey case to argue that the allegations are insufficient.  In the case, the court dismissed consumer protection claims under New Jersey and Florida law when the plaintiffs made "repeated reference to the diminished value of their vehicles, . . . without any attempt to quantify the diminished value in any way." *In re Caterpillar, Inc., C13 & C15 Engine Prod. Liab. Litig.*, No. 1:14-CV-3722 JBS-JS, 2015 WL 4591236, at *38 (D.N.J. July 29, 2015).

The *Caterpillar* court cited an earlier District of New Jersey case which dismissed consumer protection claims, also under New Jersey and Florida law, because the allegations in support of the diminished value theory of ascertainable loss were not pleaded adequately.  *In re Riddell Concussion Reduction Litig.*, 77 F. Supp. 3d 422, 438-39 (D.N.J. 2015) ("The Amended

Complaint merely states that each plaintiff paid a 'price premium' for Defendants' product and fails to identify the specific price paid or allege any other facts necessary to plead injury or ascertainable loss") (citing, *inter alia*, *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006) ("'the measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties.'") (quoting *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. Dist. Ct. App. 1984)).

Plaintiff argues that *Caterpillar* is not controlling because it is contradicted by Oregon case law, is inapposite, and has been discredited. She also argues that because the statute allows statutory damages of $200 *or* actual damages, she does not need to allege the amount of the price difference because ultimately, that difference is irrelevant if she and the class seek only statutory damages.

Plaintiff is correct that a 2016 case from the Eastern District of New York explained that *Rollins*, the Florida case cited in *Riddell*, which *Caterpillar* relied on, did not support the conclusion in *Riddell* and *Caterpillar* that Florida's consumer protection statutes require pleading the price of comparable products to sufficiently allege ascertainable loss. *Hasemann v. Gerber Prods. Co.*, No. 15-cv-2995, 2016 WL 5477595, at *22 (E.D.N.Y. Sept. 28, 2016) (noting that the court in *Rollins, Inc. v. Butlund*, 951 So. 2d 860 (Fla. Dist. Ct. App. 2006), relied on by *Riddell*, did not hold that a plaintiff must plead the price of comparable products); *see also Schechner v. Whirlpool Corp.*, 237 F. Supp. 3d 601, 620 (E.D. Mich. 2017) (finding that neither the text of the Florida statute nor the relevant cases supported the ascertainable loss requirement as set forth in *Caterpillar*) (citing *Hasemann*, 2016 WL 5477595, at *22); *In re ConAgra Foods,*

*Inc.*, 908 F. Supp. 2d 1090, 1107-08 (C.D. Cal. 2012) (in analyzing consumer protection claims brought under several state statutes, court observed that Oregon required less rigorous pleading of ascertainable loss than New Jersey). I agree with Plaintiff that *Caterpillar* has limited persuasive value and ultimately, Oregon law controls.

Under Oregon's statute, evidence of "some loss" is required. *Scott v. Western Int'l Surplus Sales, Inc.*, 267 Or. 512, 516, 517 P.2d 661, 663 (1973). In *Scott*, the plaintiff brought a UTPA claim based on his purchase of a tent. A card on the tent stated "Nylon Net Rear Window with ZIPPERED flap." *Id.* at 514, 517 P.2d at 662. A diagram on the card pictured the flap. *Id.* The card also pictured a tent with eaves. *Id.* As the plaintiff discovered after his purchase when he opened the tent package at home, the tent did not have a window with a secured flap or eaves. *Id.* The plaintiff sued. After a bench trial, the court awarded the plaintiff $200 in statutory damages. *Id.* Although the defendant did not move against or demur to the complaint, it contended on appeal that the plaintiff failed to prove an ascertainable loss. *Id.* at 515, 517 P.2d at 662.

The Oregon Supreme Court rejected the defendant's argument. It explained that under the statute, there was "no need to allege or prove the amount of 'ascertainable loss.'" *Id.* If the plaintiff proves "any amount" of an ascertainable loss, the plaintiff may recover the $200 in minimum damages. *Id.* at 515, 517 P.3d at 662-63. The court explained that there was, in fact, evidence of an ascertainable loss. *Id.* It wrote:

> The tent was purchased for $38.86. The inference is that the tent, as represented [with a secured flap and eaves] had that value. The tent sold did not have some of those represented features. The inference can be drawn that because the tent did not have a window with a closing flap or eaves it had a value of less than $38.86. To repeat, the plaintiff did not have to prove in what amount the value of the tent

was reduced because it was not as represented.  He merely had to prove he
suffered some loss.

*Id.* at 515-16, 517 P.2d at 663; *see also Pearson*, 358 Or. at 121 n.18, 361 P.3d at 25 n.18 (noting

that the plaintiff in *Scott* might have had a problem given the "state of the record" in that case had

he sought damages in the amount of the actual diminished value of the tent he received, but,

because he sought to recover only the statutory minimum of $200, he could prevail based on a

showing of "some loss").

Under *Scott*, Plaintiff has to allege facts showing "some loss."  She does not have to

allege facts showing the specific amount of loss to withstand a motion to dismiss.  *Hamilton v.*

*General Mills, Inc*, No. 6:16-cv-382-MC, 2016 WL 6542840 (D. Or. Nov. 2, 2016), *appeal filed*,

No. 16-36004 (9th Cir. Dec. 1, 2016), cited by Defendant, does not hold to the contrary.  There,

the plaintiff argued that the $200 statutory damages is an ascertainable loss sufficient to establish

standing in an Oregon UTPA claim.  *Id.* at *2.  The court noted that before entitlement to *either*

statutory or actual damages, a UTPA plaintiff must suffer an ascertainable loss.  *Id.*  Because the

plaintiff had not alleged anything other than statutory damages, he failed to meet his burden of

showing an injury-in-fact required to establish standing.  *Id.*  The assertion of only statutory

damages was not the same as the assertion of facts demonstrating "some loss" which would

demonstrate actual injury and then entitle a UTPA plaintiff to statutory damages.

The question here is whether Plaintiff's allegations of diminished value in the Second

Amended Complaint are sufficient to show "some loss."  She must allege facts which support an

inference that the product as represented had a value greater than the value of the product she

actually received.  Allegations suggesting that the product costs the same with or without the

represented characteristic cannot logically support an inference that the product without the feature is worth less. *Pearson*, 358 Or. at 122, 361 P.3d at 25.

The operative allegations in support of the diminished value theory are that Plaintiff and the class "paid more money, per fluid ounce, for defendant's so-called coconut product than they could have paid for other similar beverage products that also did not contain any actual coconut." Sec. Am. Compl. ¶ 16. As a result of the alleged misrepresentations regarding coconut, Plaintiff and the Oregon class "suffered an ascertainable loss in the amount of the diminished value between the higher price paid per fluid ounce for defendant's so-called coconut product and the lower price that they could have paid for those similar alternative beverage products[.]" *Id.*

These allegations are sufficient. If Plaintiff had alleged only that she and the class suffered an "ascertainable loss," the allegation would not pass muster under *Iqbal* and *Twombly*. However, Plaintiff has alleged more than just a conclusory assertion. The allegations assert that Plaintiff and the class "paid more money" and a "higher price" because of Defendant's alleged misrepresentations. They also assert that the comparable product is a similar product that contained no coconut. These allegations support an inference, like in *Scott*, that the price Plaintiff paid was the value of the product as represented and that because the product did not actually contain coconut, it had a value of less than what Plaintiff paid. Given that Plaintiff paid only $0.68 for the product, it remains to be seen if she will eventually prevail. But, at the pleading stage, she has alleged sufficient facts to support a diminished value theory.

B. Purchase Price Refund Theory

The purchase price refund theory is based on the alleged failure to receive what Defendant's alleged misrepresentation led Plaintiff to believe she was buying. *See Pearson*, 358

Or. at 124, 361 P.3d at 26.  The remedy is a refund of the purchase price.  *Id.* at 119, 124, 361

P.3d at 23, 27.  As I explained in the June 15, 2017 Opinion, *Pearson* expressly held that reliance

is required to support a loss based on the purchase price.  June 15, 2017 Op., 2017 WL 2642286,

at *11 (explaining that as "'a function of logic,'" because the statute requires the loss to be caused

by the misrepresentation, "'when the claimed loss is the purchase price[,]'" "'reliance is what

connects the dots to provide the key causal link between the misrepresentation and the loss.'")

(quoting *Pearson* 358 Or. at 126, 361 P.3d at 27).

Defendant argues that Plaintiff fails to allege sufficient facts to support the purchase price

refund damages claim.  Defendant's argument relies primarily on its contention that no

reasonable consumer could conclude that the product's label was misleading and thus, "the label

cannot serve as the basis of plaintiff's reliance for her 'product purchase price' theory of

ascertainable loss."  Def. Mot. 23; *see also* Def. Reply 16, ECF 32 ("Plaintiff's unreasonable

interpretation" of the label defeats any allegation of reliance).  Given my conclusion above that a

reasonable consumer could find the label as a whole misleading, even though it states expressly

that the beverage contains no coconut, Defendant's argument fails.

And, while I dismissed the Amended Complaint because it contained no allegations of

reliance, Plaintiff has cured that defect in the Second Amended Complaint where she alleges that

she

> relied on defendant's representations on the face of its product's label - including
> prominent picture[s] of coconuts emptied of their liquid and the word "Coconut"
> in large font directly above the phrase "Naturally Flavored Sparkling Water []" -
> for her decision to purchase defendant's product, thinking it was flavored with and
> contained some amount of actual coconut, would taste like coconut, and would
> have some coconut health properties.

21 - OPINION & ORDER

Sec. Am. Compl. ¶ 6.  She further alleges that

> as a result of defendant's false representations that its so-called coconut product
> was flavored by and contained some actual coconut, Vicky Silva would not have
> purchased defendant's product.  The substance and nature of the false
> representations, and the very limited information presented on the front of the
> product's label, support a logical inference that the Oregon class purchased
> defendant's product coconut beverage as a result of defendant's false
> representation that its so-called coconut product was flavored by and contained
> some actual coconut.  As a result of defendant's misrepresentations, Vicki Silva
> and the Oregon class have also suffered an ascertainable loss in the form of a
> refund of the purchase price they paid for defendant's so-called coconut product.

*Id.* ¶ 17.

These are sufficient allegations of reliance.  First, there is an express allegation that
Plaintiff relied on the coconut representations in her decision to purchase the product.  *Id.* ¶ 6.
Second, Paragraph 17, although not using the word "relied" or "reliance," essentially alleges that
Plaintiff would not have purchased the product absent the allegedly false representation relating
to coconut and that Plaintiff and the class purchased the beverage because of the allegedly false
representation.  *Id.* ¶ 17.  These allegations are reasonably understood as asserting that Plaintiff
and the class relied on the coconut representation in purchasing the product.

Defendant contends that dismissal of allegations supporting the purchase price theory is
also appropriate because Plaintiff fails to allege what she would have done differently absent any
alleged misrepresentation.  Assuming for the purposes of this Opinion only that such an
allegation is required to state a claim based on this damages theory, the Second Amended
Complaint does allege that Plaintiff "would not have purchased the product."  *Id.* ¶ 6.  Although
perhaps not as clearly stated as it could have been, this allegation in Paragraph 6 sufficiently
contends that absent the misrepresentation she would not have purchased the product.  The

Second Amended Complaint sufficiently states ascertainable loss based on a purchase price theory.[7]

C. Objective Market Value Loss Theory

In Paragraph 18, Plaintiff alleges as follows:

[A]s a result of defendant's false representations, and the likelihood of confusion or misunderstanding caused by the representations that its so-called coconut product was flavored by and contained some actual coconut, Vicky Silva and the Oregon class ended up with a product that did not actually contain any of the very ingredient, and its corresponding properties and benefits, that was represented. Thus, Vicky Silva and the Oregon class have also suffered an objective ascertainable loss, capable of being discovered, in the form of the value of the benefits, ingredients, and properties of the product which they were led to believe they had purchased . . . *See Weigel v. Ron Tonkin Chevrolet Co.*, 298 Or. 127, 136-37, 690 P.2d 488 (1984).

Sec. Am. Compl. ¶ 18. In her briefing, she refers to this as the "Objective Market Value Loss Theory." Pl. Resp. 31.

Defendant argues that these allegations fail to state an ascertainable loss because they amount to one conclusory statement and a citation to a case. Defendant also argues that the presence of the "Contains No Coconut" language on the product defeats any claim that she did not get what was represented. Defendant additionally argues that Plaintiff fails to plead facts that could allow the objective verification of Plaintiff's loss. Defendant adds that "[w]ithout any misrepresentations by Unique, plaintiff needs to explain how she did not receive the value of Unique's Cascade Ice product." Def. Mot. 25. Finally, Defendant argues that the case cited by Plaintiff, *Weigel*, is distinguishable on its facts.

--------------------------------------------------

[7] In response to Defendant's motion, Plaintiff argues that a showing of reliance is not required for the purchase price theory of damages. Pl. Resp. 27-29 (citing *Tri-West Constr. Co. v. Hernandez*, 43 Or. App. 961, 607 P.2d 1375 (1979)). Because the Second Amended Complaint adequately pleads reliance, I do not address this argument.

In response, Plaintiff contends that the assertion of ascertainable loss under the UTPA is not limited to the diminished value and purchase price refund theories. She argues that under *Weigel*, the Oregon Supreme Court recognized an "objective loss in market value" theory as a "viable alternative[.]" Pl. Resp. 31. She argues that as a result of Defendant's misrepresentation about the product, she "ended up with" a product that did not contain the benefits, ingredients, feature, and properties that she was led to believe the product contained. *Id.* at 32. The loss, she contends, is "objectively verifiable" by inference, as was the tent in *Scott,* or is "capable of being independently valued in the market, or as represented by the difference between a similar product that actually contains some actual coconut and one that does not (such as defendant's so-called coconut product)." *Id.* She asserts that she has "sufficiently alleged this alternative theory of ascertainable loss[.]" *Id.*

Given my earlier conclusion that reasonable consumers could find the label misleading, Defendant's arguments based on a determination that its product contained no misrepresentation are without merit. However, I nonetheless dismiss the allegations in Paragraph 18. *Weigel* did not recognize an "objective loss in market value" theory as an alternative to a diminished value theory. As a result, the allegations in Paragraph 18 do not assert an independent and third theory of ascertainable loss and thus, I agree with Defendant that these allegations should be dismissed.

In *Weigel*, the plaintiff purchased a car from the defendant which the defendant represented was new. 298 Or. at 129, 690 P.2d at 490. The car, however, had already been conditionally sold to a customer who took possession of it for several days and then returned it because of problems with financing. The "chief issue" in the case was whether the car dealer violated a provision of the UTPA in "selling as new a car that an earlier customer conditionally

contracted to buy and took home but returned for lack of financing." *Id.* Concluding that the meanings of "new" and "used" in this particular section of the UTPA were questions of law for the court, the court held that a car is "used" rather than "new" when the dealer "previously has given any person legal possession of the automobile for that person's discretionary use for his or her own purposes, beyond the limited purpose of a try-out before a contemplated purchase." *Id.* (stating holding); *id.* at 130-33, 690 P.2d at 490-92 (discussion in support of holding). Given the undisputed facts, the court concluded that the car sold by the defendant to the plaintiff was used as a matter of law. *Id.* at 133, 690 P.2d at 492.

The court next addressed the defendant's argument that the plaintiff failed to prove "ascertainable loss." The court noted that what the legislature meant by "ascertainable loss of money or property" in the UTPA was "not free from doubt." *Id.* at 133, 690 P.2d at 492. It observed that the case had been tried on the theory "that a plaintiff must show an economic loss in the sense of a difference between the price paid and some objective measure of market value." *Id.* at 133, 690 P.2d at 492-93. The court agreed that this was "one plausible reading of the statute." *Id.* The court suggested other possible readings, however, including that the legislature may have meant the "loss of money or property" to include "the expenditure of funds for goods that are not as desired by the customer and represented by the seller irrespective of their market value to others." *Id.* at 134, 690 P.2d at 493.

The court's discussion next examined the overall structure of the UTPA and explained that in enacting O.R.S. 646.638, the "legislature was concerned as much with devising sanctions for the prescribed standards of trade and commerce as with remedying private losses, and that such losses therefore should be viewed broadly." *Id.* at 135-36, 690 P.2d at 494. The court then

looked at cases from Maine and Connecticut, noting that the Maine statute was distinguishable and thus the Maine cases denying recovery to purchasers who found that they received something less than what the seller had represented, were not persuasive. *Id.* a 136, 690 P.2ds at 494.

Instead, the court found a Connecticut case to be on point. *Id.* The court noted that in *Hinchliffe v. American Motors Corp.*, 184 Conn. 607, 440 A.2d 810 (1981), the Connecticut Supreme Court interpreted Connecticut's UTPA (CUTPA) to allow buyers of a car that did not meet advertised specifications to recover damages without proving a specific amount of actual damages. *Id.* at 136-37, 690 P.2d at 494 (discussing Hinchliffe). The *Weigel* court quoted the following passage from *Hinchliffe*:

> "Whenever a consumer has received something other than what he bargained for, he has suffered a loss of money or property. That loss is ascertainable if it is measurable even though the precise amount of the loss is not known. CUTPA is not designed to afford a remedy for trifles. In one sense the buyer has lost the purchase price of the item because he parted with his money reasonably expecting to receive a particular item or service. When the product fails to measure up, the consumer has been injured; he has suffered a loss. In another sense he has lost the benefits of the product which he was led to believe he had purchased. That this loss does not consist of a diminution in value is immaterial although obviously such diminution would satisfy the statute. To the consumer who wishes to purchase an energy saving subcompact, for example is no answer to say that he should be satisfied with a more valuable gas guzzler."

*Id.* at 136-37, 690 P.2d at 494-95 (quoting *Hinchliffe*, 184 Conn. at 614, 440 A.2d at 814; further citing *Mayhall v. A.H. Pond Co., Inc.*, 129 Mich. App. 178, 341 N.W.2d 268 (1983) for the proposition that "frustration of a buyer's expectations is a 'loss' under similar Michigan statutes"). The court also noted that previously in *Scott*, it had not decided whether an "objective 'diminution in value' is required [under the UTPA], because the court there 'inferred' that a tent lacking certain features would have a value below the price that was charged upon a

representation that included these features." *Id.* at 137, 690 P.2d at 495 (citing *Scott*, 267 Or. 512, 517 P.2d 661).

Ultimately, the *Weigel* court found that the "present case" also did *not* "turn on the question whether any objective loss in market value is required" because there was evidence from the defendant itself that the car, if used, had a "depreciated value to some extent[.]  *Id.*  Thus, there was evidence besides Plaintiff's own testimony of the diminution of value caused by the car being "used" instead of "new."  Even if the difference in value was short of the $1,000 asserted by the plaintiff, the defendant's salesman's testimony sufficed to establish some ascertainable loss and allowed an award of the $200 statutory damages.  *Id.*

Contrary to Plaintiff's argument, *Weigel* does not establish an objective theory of ascertainable loss different from the theories Plaintiff has already asserted.  The issue the court addressed was whether the plaintiff had to show ascertainable loss in a diminished value theory with an "objective measure of market value."  *Id.* at 133, 690 P.2d at 492-93.  The court never actually answered that question because the defendant's salesman's testimony established that a "used" car was worth less than the "new" car the defendant had represented the car to be.  *Id.* at 137, 690 P.2d at 495 ("[s]crutiny of the record reveals that the present case also does not turn on the question whether any objective loss in market value is required.").  Because that was enough to support the jury's $200 statutory damage award, no further discussion of the issue was required.

The *Weigel* court did devote several paragraphs to the question of what was meant by "ascertainable loss" in the UTPA.  The discussion is notable for endorsing the purchase price refund theory even if the court did not call out that theory by that name.  In the quoted passage

from *Hinchliffe*, the Connecticut court held that a diminution of value theory is not the only concept of loss which will support a CUPTA claim. The court recognized that in addition to that theory, a loss is suffered when the consumer purchases a product believing it to be one thing yet receives something else. *Hinchliffe*, 184 Conn. at 614, 440 A.2d at 814. This type of loss recognizes that "the buyer has lost the purchase price of the item because he parted with his money reasonably expecting to receive a particular item or service." *Id.* If the product is not as represented, the "consumer has been injured." *Id.* (explaining further that the consumer has lost the benefits of the product which he was led to believe he had purchased).

The *Weigel* court discussed *Hinchliffe* in order to show that "ascertainable loss" in a statute similar to Oregon's UTPA had been interpreted to include a loss based on something other than a diminished value theory requiring objective loss in market value. *Weigel* did not rely on *Hinchliffe* to establish an alternative theory based on some ill-defined loss of the "benefits" of the product. And, as noted, in the end, *Weigel's* affirmance of the judgment in favor of the plaintiff did not resolve the issue of whether objective market value was required for a diminished value theory and it did not rely on the product price theory even after discussing the basis for that theory.

The question addressed in *Hinchliffe* was whether a plaintiff must prove actual damages under the CUTPA. 184 Conn. at 612, 440 A.2d at 813. The court held that a plaintiff did not need to prove a specific amount of actual damages to make out a prima facie case under the statute. *Id.* at 613, 440 A.2d at 813-14. In reaching that holding, the court set forth the reasoning that the *Weigel* court quoted: when a consumer receives something other than what he or she has bargained for, a loss of money or property occurs, even if the amount cannot be established with

precision. *Id.* at 614, 44 A.2d at 814. The *Hinchliffe* court then squarely held that the CUTPA was not limited to "providing redress only for consumers who can put a precise dollars and cents figure on their loss." *Id.* at 618, 440 A.2d at 816. Later in the opinion, the court explained that in any event, the plaintiff had actually established a diminution in value based on the misrepresentation. *Id.* at 619, 440 A.2d at 816-17. *Hinchliffe* does not address a damages theory independent of a diminution of value or purchase price refund. Accordingly, neither *Weigel* nor *Hinchliffe* supports Plaintiff's argument that her allegations in Paragraph 18 assert a viable theory of ascertainable loss separate from what she has already alleged.

Justice Walters's concurring opinion in *Pearson* confirms this reading of *Weigel*. There, she addressed what she believed was a difference between a diminished value theory and product price refund theory in regard to the requirement of reliance. *Pearson*, 358 Or. 142-44, 361 P.3d at 36-37. She initially cited to *Weigel* to explain that the concept of loss under the UTPA should be viewed broadly, and that private claims are not limited to those "where a plaintiff shows 'an economic loss in the sense of a difference between the price paid and some objective measure of market value'" because the statute permits claims "when a plaintiff can establish a loss based on the fact that he or she expended funds 'for goods that are not as desired by the customer and represented by the seller irrespective of their market value to others.'" *Id.* at 142, 361 P.3d at 36 (quoting *Weigel*, 298 Or. at 133, 134, 690 P.2d at 492-93).

Continuing in her discussion, Justice Walters explained that a plaintiff who cannot show "'an economic loss in the sense of a difference between the price paid and some objective measure of market value,'" may still state a claim by showing that he or she would not have purchased a product but for the seller's misrepresentation. *Id.* (quoting *Weigel*, 298 Or. at 133,

690 P.2d at 492-93).  In that case, the plaintiff may seek return of the money paid for the product irrespective of its market value.  *Id.*  Judge Walters's concurrence thus recognized that *Weigel* discusses both the diminution in value theory and the product price refund theory and did not create a separate "objective market value loss theory."

Justice Walters then continued to discuss the reliance requirement in eventually concluding that in her view, in a diminished value theory, the consumer's *purchase* does not need to be as a "result" of the unlawful trade practice and instead, it is the consumer's ascertainable *loss* which must be attributed to the unlawful trade practice.  In reaching this conclusion, she explained that in a diminished value theory, the "plaintiff's ascertainable loss is not the full amount of the purchase price; rather it is the difference between the purchase price and the market value of the item purchased."  *Id.* at 143, 361 P.3d at 37.  As part of her discussion in support of her conclusion, Justice Walters posed a hypothetical reminiscent of the facts in *Scott*, the case about the tent without eaves or a secured flap.  The tent in her example cost $100.  *Id.* The seller represented it had a characteristic it did not have.  *Id.*  The plaintiff paid the market value of the tent as represented but the tent was not as represented.  *Id.* at 143-44, 361 P.3d at 37. The tent without the particular feature she desired had a market value of no more than $80.  *Id.* at 143, 361 P.3d at 37.  The "economic loss was the difference between the purchase price of the tent as represented ($100) and the *objective market value of the tent that the plaintiff received* ($80) - a difference of $20."  *Id.* at 144, 361 P.3d at 37 (emphasis added).  "Because the tent was not as represented, the plaintiff suffered economic loss when she paid more for the tent than it was objectively worth."  *Id.*  Her discussion reinforces that the references to "objective market value" is part of a diminished value theory and not an independent, distinct theory of loss.

Plaintiff misapprehends *Weigel*.  There is no "objective loss of market value theory of ascertainable loss" separate from a diminished value theory.  While a diminished value theory may be sustained by something other than "objective" market value evidence as it was in *Weigel* (the defendant's salesman's testimony), or by inference as it was in *Scott* (inferring that a tent without eaves or secured flap had a lower market value than what the plaintiff paid for a tent which represented it possessed those features), the essential assumption of the theory is that certain represented features of the product enhance the product's value and the product without those features is worth less than what the plaintiff paid for the product.  Plaintiff's allegations in Paragraph 18 are that (1) she "ended up" with a product that did not contain the represented coconut feature or ingredient and (2) her loss is the equivalent of the value of that ingredient or feature.  This is a diminished value theory and nothing more.

Plaintiff is correct that UTPA losses are not limited to those evaluated under a diminished value theory or a purchase price refund theory.  *See Pearson*, 358 Or. at 142 n.1, 361 P.3d at 36 n.1 (in concurring opinion, Justice Walters noted that by discussing the differences between the diminished value theory and the purchase price refund theory for UTPA claims, she did not intend to imply that other theories of loss may not be actionable).  Oregon courts have recognized other ways loss can occur.  *E.g. Feiter v. Animation Celection, Inc.*, 170 Or. App. 702, 712-13, 13 P.3d 1044, 1050 (2000) (noting that "ascertainable loss" under the UTPA was "amorphous" and concluding that in a claim where the defendant misrepresented that a collection of drawings was exclusive, ascertainable loss occurred based on the plaintiff having to purchase the later discovered drawings in order to obtain the promised feature of exclusivity).  Nonetheless, the allegations in Paragraph 18 do not state a cognizable theory of ascertainable loss separate and

apart from the two theories already alleged in Paragraphs 16 and 17 of the Second Amended Complaint.  Thus, I grant Defendant's motion as to Paragraph 18.

CONCLUSION

Defendant's request for judicial notice [30] is granted.  Defendant's motion to dismiss the Second Amended Complaint [29] is denied as moot as to any injunctive relief claim, is granted as to the allegations in Paragraph 18, and is otherwise denied.

IT IS SO ORDERED.

Dated this ___30___ day of _____October_____, 2017

Marco A. Hernandez
United States District Judge